IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOHN FRANCIS,

       Plaintiff,               No. 2:09-cv-0640 JAM KJN P

  vs.

MATTHEW CATE, et al.,

       Defendants.        FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Plaintiff, a state prisoner proceeding without counsel, seeks relief pursuant to 42 U.S.C. § 1983.  This case is proceeding on the original complaint, filed March 9, 2009. Plaintiff alleges that defendants were deliberately indifferent to plaintiff's serious medical needs based on plaintiff's allegations that he was subjected to extended periods of severe back pain when he was not provided appropriate pain medications.  Pending before the court is the motion for summary judgment filed by defendants Baca and Newman.[1]  As explained more fully below, the court recommends that defendant Baca's motion for summary judgment be partially granted,

---

[1] Defendants Mendoza, Cate, Grannis and Shea were dismissed on July 6, 2009.  (Dkt. No. 9.)  Defendant Snell was dismissed on March 31, 2010.  (Dkt. No. 28.)  Defendants Street, Reichert, and Pomazzal are proceeding in this action, but have not moved for summary judgment.

1   and defendant Newman's motion for summary judgment be granted.

2   II.  Motion for Summary Judgment

3   Defendants Baca and Newman move for summary judgment on the grounds that

4   there are no genuine issues of material facts and they are entitled to judgment as a matter of law.

5   Plaintiff filed an opposition.  No reply was filed.

6   Neither the complaint nor plaintiff's opposition are verified.  Plaintiff provided a

7   declaration, however, the declaration attests to the authenticity of the appended 602 appeals,

8   medical records and sick call slips.  (Dkt. No. 60 at 7.)

9   A.  Legal Standard for Summary Judgment

10  Summary judgment is appropriate when it is demonstrated that the standard set

11  forth in Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if

12  the movant shows that there is no genuine dispute as to any material fact and the movant is

13  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[2]

14    Under summary judgment practice, the moving party always bears
  the initial responsibility of informing the district court of the basis
15    for its motion, and identifying those portions of "the pleadings,
  depositions, answers to interrogatories, and admissions on file,
16    together with the affidavits, if any," which it believes demonstrate
  the absence of a genuine issue of material fact.

17

18  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

19  56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need

20  only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

21  Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

22  387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory

23  committee's notes to 2010 amendments (recognizing that "a party who does not have the trial

24  _____

25    [2]  Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10,
2010.  However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule
26  56, "[t]he standard for granting summary judgment remains unchanged."

burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact"). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

1  committee's note on 1963 amendments).

2         In resolving a summary judgment motion, the court examines the pleadings,

3  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

4  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

5  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

6  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

7  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

8  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

9  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

10  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

11  show that there is some metaphysical doubt as to the material facts. . . . Where the record taken

12  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

13  'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

14         By order filed August 4, 2009, the court advised plaintiff of the requirements for

15  opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt.

16  No. 19); see Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v.

17  Eikenberry, 849 F.2d 409 (9th Cir. 1988).

18         B.  Civil Rights Claims Standards

19         The Civil Rights Act under which this action was filed provides as follows:
       Every person who, under color of [state law] . . . subjects, or causes
20       to be subjected, any citizen of the United States . . . to the
       deprivation of any rights, privileges, or immunities secured by the
21       Constitution . . . shall be liable to the party injured in an action at
       law, suit in equity, or other proper proceeding for redress.
22

23  42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

24  actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

25  Monell v. Department of Social Servs., 436 U.S. 658, 692 (1978) ("Congress did not intend

26  § 1983 liability to attach where . . . causation [is] absent."); Rizzo v. Goode, 423 U.S. 362 (1976)

4

1   (no affirmative link between the incidents of police misconduct and the adoption of any plan or

2   policy demonstrating their authorization or approval of such misconduct).  "A person 'subjects'

3   another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an

4   affirmative act, participates in another's affirmative acts or omits to perform an act which he is

5   legally required to do that causes the deprivation of which complaint is made."  Johnson v.

6   Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

7   III.  Undisputed Facts

8           For purposes of the instant motion for summary judgment, the court finds the

9   following facts undisputed.

10          1.  Plaintiff was in the custody of the California Department of Corrections and

11  Rehabilitation ("CDCR") at the Deuel Vocational Institution ("DVI") between August of 2007

12  and June of 2008.

13          2.  Christina Baca was the Health Care Manager at DVI while plaintiff was

14  housed at DVI.  Defendant Baca is not a medical doctor.  (Pl.'s Deposition ("Dep.") at 46:15-19.)

15          3.  In her capacity as Health Care Manager, defendant Baca responds to medical

16  appeals.  (Pl.'s Dep. at 46:20-21.)

17          4.  Following his arrival at DVI, plaintiff was seen by Dr. Mendoza who, in

18  response to plaintiff's complaints of severe back pain, prescribed plaintiff a thirty day supply of

19  Morphine.  The Morphine prescription helped, but did not alleviate plaintiff's back pain.

20          5.  In anticipation of the need to renew the Morphine prescription, plaintiff filled

21  out a sick call slip and was seen by Michelle Street, Physician's Assistant ("P.A."), in August of

22  2007.

23          6.  Plaintiff's visit with defendant Street escalated into an argument; defendant

24  Street ordered plaintiff to leave.  (Pl.'s Dep. at 51.)  Defendant Street did not renew plaintiff's

25  prescription for Morphine.  Plaintiff later learned, through an Olsen Review of his medical

26  records, that defendant Street had noted her belief that plaintiff was drug-seeking.  (Pl.'s Dep. at

52.)

7.  Immediately after seeing defendant Street, plaintiff completed a sick call slip. (Pl.'s Dep. at 53:7.)  Plaintiff was seen "quite a few times" thereafter by nurses or physician's assistants, but he was not prescribed any medications.  (Pl.'s Dep. at 53:8-14; 59:19-23.)

8.  The nurses referred plaintiff to Dr. Newman, but plaintiff did not see Dr. Newman until some time between September and October 2007.  (Pl.'s Dep. at 53:21-24.)[3] During this visit, Dr. Newman performed a physical examination, including range of motion tests to determine plaintiff's pain levels, ordered x-rays, and prescribed physical therapy and thirty day supplies of Vicodin and Neurontin in response to plaintiff's complaints of pain.  (Pl.'s Dep. at 53-57.)

9.  Prior to the expiration of plaintiff's pain medication prescription, plaintiff filled out sick call slips to see medical staff to have the pain medication prescription renewed. (Pl.'s Dep. at 58.)

10.  Plaintiff is a chronic care patient.  (Pl.'s Dep. at 61.)  Plaintiff confirmed that the chronic care clinic would call the patient in for an appointment "every thirty days or thereabouts, . . . [the clinic] would find out how you're doing, what your pain level is, how the pain medication is working . . . and discuss renewal of . . . medications" if needed.  (Id.)

11.  During the alleged two month period when plaintiff was allegedly not receiving his pain medications, if plaintiff presented at chronic care clinic and was assigned to see defendant Street, plaintiff refused to see defendant Street, left the clinic and filled out a sick

////

////

---

[3]  In his unverified opposition, plaintiff now states he believes he saw Dr. Newman in October or November, and the reason he saw Dr. Newman was because Dr. Newman was allegedly answering a 602 appeal.  (Dkt. No. 60 at 3.)  However, plaintiff does not identify the 602 appeal to which plaintiff refers, nor does plaintiff cite to any particular exhibit demonstrating the date plaintiff first saw Dr. Newman.

call slip.  (Pl.'s Dep. 59-61.)[4]

12.  Plaintiff saw defendant Newman four or five times while plaintiff was housed at DVI.  (Pl.'s Dep. at 54.)  Plaintiff saw defendant during "a few" of plaintiff's chronic care appointments, and defendant Newman "may have" renewed plaintiff's medications.  (Pl.'s Dep. at 61-62.)

13.  None of plaintiff's treating physicians have told plaintiff that the failure of any of the defendants to provide plaintiff with medication has in any way caused a long-term health effect.  (Pl.'s Dep. at 94:1-6.)

14.  At the time of plaintiff's deposition, plaintiff had been off medications for a two month period, and rated his daily pain as eight out of ten.  (Pl.'s Dep. at 94.)  When plaintiff was on narcotics medication, plaintiff rated his pain as four out of ten.  (Pl.'s Dep. at 95.)

IV.  Documentary Evidence

Pertinent inmate appeals, health care services request forms, and medical records provided by plaintiff reflect the following:

1.  On February 23, 2007, plaintiff completed a Health Care Services Request form (CDC 7362) stating he needed to see a doctor because plaintiff was not receiving pain medications that the doctor ordered.  (Dkt. No. 60 at 54.)

2.  On September 21, 2007, plaintiff was seen for follow-up pain management, and referred to a doctor.  (Dkt. No. 60 at 108.)  On September 21, 2007, plaintiff was seen by Dr. Mendoza, prescribed Neurontin, 900 mg, and Tylenol #3, with a follow-up in three weeks.  (Dkt. No. 60 at 109.)

3.  On October 12, 2007, plaintiff was seen for follow-up for his back pain, and referred to a doctor.  (Dkt. No. 60 at 110.)  Dr. Mendoza prescribed Morphine Sulfate SR 15 mg

---

[4]  In his unverified opposition, plaintiff states that "there was only two times [he] ever had to see [defendant] Street and only one of those visits was concerning the renewal of medications."  (Dkt. No. 60 at 3.)

two times daily, 30 tablets, with an expiration date of November 11, 2007.  (Dkt. No. 60 at 102, 111.)  Dr. Mendoza noted plaintiff's follow-up in thirty days.  (Dkt. No. 60 at 111.)  On October 12, 2007, Dr. Mendoza prescribed Methocarbamol, 500 mg, 1 tablet 2 times a day, with an expiration date of January 10, 2008.  (Dkt. No. 60 at 104.)

        4.  On October 29, 2007, Dr. Mendoza prescribed Morphine Sulfate SR 15 mg two times daily, 24 tablets, with an expiration date of November 11, 2007.  (Dkt. No. 60 at 103.)

        5.  On November 11, 2007, plaintiff signed a CDC 7362 form stating he was seen by defendant Street on [illegible] and defendant Street said she would not "renew or up" plaintiff's prescription and defendant Street told plaintiff she would make it so plaintiff "ran out without seeing a doctor, which [plaintiff] was supposed to be [seen] for [his] medication, but was denied this because of PA Street."  (Dkt. No. 60 at 65.)

        6.  On November 18, 2007, plaintiff completed a form CDC 7362 stating his pain medications ran out on "the 11th," and plaintiff was in pain.  Plaintiff stated the medication he was on "does no good at all," and he had been trying to see a doctor since the "5th."  (Dkt. No. 60 at 51.)

        7.  On November 23, 2007, plaintiff completed a CDC 7362 form stating he was seen by an unidentified person (plaintiff left it blank) the night before and was refused any medication and the muscle relaxers were discontinued.  (Dkt. No. 60 at 58.)

        8.  On November 26, 2007, plaintiff signed a CDC 7362 form stating that all of his pain medication was discontinued by an unidentified physician's assistant, and that plaintiff had been unable to see a doctor since he saw Dr. Mendoza in October.  (Dkt. No. 60 at 56.)

        9.  On December 7, 2007, plaintiff completed a CDC 7362 form stating he needed to see a doctor about his back and pain medication because plaintiff was "still getting nothing and in severe pain."  (Dkt. No. 60 at 63.)

        10.  On December 10, 2007, plaintiff signed a CDC 7362 form stating he needed to see a doctor for severe back pain and muscle spasms, and claiming plaintiff had been without

1  pain medications for one and a half months.  (Dkt. No. 60 at 62.)

2        11.  On December 13, 2007, plaintiff completed a CDC 7362 form stating he had

3  not received the pain medications that defendant Newman ordered on December 7, 2007.  (Dkt.

4  No. 60 at 61.)  Plaintiff asked to see another doctor to get something for the pain and the muscle

5  spasms in plaintiff's back.  (Dkt. No. 60 at 61.)

6        12.  On December 14, 2007, plaintiff completed a CDC 7362 form stating he went

7  to the doctor December 7, 2007, and was told the "Dr. New" ordered plaintiff something for

8  pain, but plaintiff was not given this medication and has been unable to see another doctor.  (Dkt.

9  No. 60 at 59.)  Plaintiff stated he needed to see a doctor because he was in severe pain with

10  muscle spasms.  (Dkt. No. 60 at 59.)

11        Plaintiff provided a second CDC 7362 form dated December 14, 2007, in which

12  plaintiff stated he was in severe back pain, with muscle spasms, and could not sleep.  (Dkt. No.

13  60 at 64.)  Plaintiff stated he had been without pain medications for one month.  (Id.)

14        13.  On December 19, 2007, plaintiff signed a CDC 7362 form, stating "every

15  time [he saw] the doctor and [the doctor] ordered pain medications, [plaintiff has] not gotten

16  [them] at all."  (Dkt. No. 60 at 53.)  Plaintiff stated he needed something for pain and he had

17  been in pain for almost two months.  (Dkt. No. 60 at 53.)

18        14.  On December 19, 2007, plaintiff completed a second CDC 7362 form, stating

19  "for the 3rd time I was seen and prescriptions were written for back pain, for which [he] still has

20  not received any medication at all."  (Dkt. No. 60 at 60.)  Plaintiff stated he was in severe and

21  constant pain with muscle spasms.  (Id.)

22        15.  On December 20, 2007, plaintiff completed a CDC 7362 form, stating he

23  needed to see a doctor "ASAP," because every time I've seen him for the last 3 times, the doctor

24  ordered pain medications, but plaintiff did not receive them.  (Dkt. No. 60 at 52.)  Plaintiff stated

25  he was in pain with severe muscle spasms.  (Id.)

26        16.  On December 28, 2007, plaintiff completed a CDC 7362 form, stating he

1  needed to see a doctor because he was still getting no pain medications, was in terrible pain, and

2  had been in pain since the beginning of November.  (Dkt. No. 60 at 55.)

3            17.  On February 21, 2008, defendant Baca signed a first level response

4  concerning plaintiff's medical problem:

> I have been trying for over 3 weeks to see Dr. Mendoza to have my
> pain medication renewed.  As it is I was seen and referred to a Dr.
> on 11/15/07, and my pain medication ran out on the 11th.  I still
> have not been able to see a Dr. regardless of how many requests I
> put in. . . .

8  (Dkt. No. 60 at 21.)  Defendant Baca cancelled the appeal, stating plaintiff "refused to return" to

9  clinic to see defendant Newman on February 21, 2008.  (Dkt. No. 60 at 21.)  Plaintiff, however,

10  claims he was not summoned to clinic on February 21, 2008, and was provided no prior notice of

11  a medical appointment on February 21, 2008.  (Dkt. No. 60 at 14-16.)  Plaintiff states there was

12  another inmate named John Francis housed at DVI, and this may have contributed to the

13  confusion.  (Dkt. No. 60 at 16.)  Plaintiff provided declarations by four other inmates who

14  declare plaintiff did not leave his cell on February 21, 2008, except for pill call and meals.  (Dkt.

15  No. 60 at 17-20.)

16           18.  On February 23, 2008, Dr. Roche signed an authorization for plaintiff to

17  receive a non-formulary drug Ultram for plaintiff's chronic pain.  (Dkt. No. 60 at 95.)  However,

18  this authorization was denied by Dr. Pomazzal, who noted "denied pending PM and use other

19  formulary meds."  (Id.)

20           Plaintiff provided a second authorization signed by Dr. Roche on February 23,

21  2008.  (Dkt. No. 60 at 96.)  Dr. Roche's comments are the same, but Dr. Pomazzal's denial

22  includes the following comments:  "Denied – what other meds on Formulary tried?"  (Dkt. No.

23  60 at 96.)

24           19.  On February 24, 2008, plaintiff filed an inmate appeal stating that his

25  medication ran out on February 20, 2008, and that he put in to see a doctor starting on February

26  6, 2008, "trying to see Dr. to get pain medication either up'd or moved to something more

effective." (Dkt. No. 60 at 33.)  Plaintiff sought reinstatement of Morphine and Gabapentin.

(Id.)  At the informal level of review, staff member J. Hernandez noted Dr. Mendoza prescribed

plaintiff Gabapentin 300 mg 3 tablets 2 times per day in November of 2007, and since that date

defendant Newman prescribed plaintiff Gabapentin 300 mg 2 tablets 2 times per day.  (Dkt. No.

60 at 33.)  Hernandez stated that Dr. Snell noted that plaintiff was to be seen in mainline to

evaluate plaintiff's pain medications requested by Dr. Tanji on February 15, 2008, and plaintiff

would be scheduled for the next available appointment.  (Dkt. No. 60 at 33.)  On March 6, 2008,

plaintiff noted his dissatisfaction with Hernandez' decision, and reported that he was still left in

excruciating pain and sleep deprivation.  (Dkt. No. 60 at 33.)

20.  Plaintiff was seen by defendant Newman on March 17, 2008 to determine

plaintiff's eligibility for the Disability Placement Program ("DPPV" or "CDC 1845 Status").

(Dkt. No. 60 at 23-24.)  The CDC 1845 Status form was signed by defendant Newman on March

19, 2008.  (Id.)  On March 17, 2008, defendant Newman signed a Comprehensive

Accommodation Chrono confirming plaintiff's housing in a ground floor cell, bottom bunk, and

authorizing the issuance of a cane and egg crate mattress.  (Dkt. No. 60 at 24.)  In her first level

response, dated April 17, 2008, defendant Baca confirmed that defendant Newman saw plaintiff

on March 17, 2008, in connection with plaintiff's appeal.  (Dkt. No. 60 at 31.)  Defendant Baca

noted plaintiff's current prescription of Gabapentin was 300 mg. (2 capsules 2 times daily).

(Dkt. No. 60 at 31.)

21.  On March 18, 2008, plaintiff was referred to pain management by P. Denny-

Griffith, P.A.  (Dkt. No. 60 at 27.)

22.  On April 4, 2008, staff member J. Hernandez noted that plaintiff was seen by

defendant Newman on April 2, 2008, who prescribed plaintiff Gabapentin 300 mg., 2 tablets, 2

times per day.  (Dkt. No. 60 at 27.)  In the next level appeal, plaintiff disputed he was prescribed

pain medication on April 2, 2008, because he claimed defendant Newman did not have plaintiff's

medical file at the appointment.  (Id.)

23.  On April 8, 2008, plaintiff was seen in the Chronic Care Program by Dr. Kevin Baiko.  (Dkt. No. 60 at 98.)  Plaintiff complained of chronic low back pain.  Dr. Baiko ordered that plaintiff's current medications be continued except that the methocarbamol should be discontinued, and a prescription for Soma would be started at "350 mg tid plus a Prednisone taper over 6 days."  (Dkt. No. 60 at 98.)  Dr. Baiko noted plaintiff's next Chronic Care visit was due in 60 days.  (Id.)

24.  On April 17, 2008, plaintiff's prescription of Gabapentin was 300 mg (2 caps 2 times per day).  (Dkt. No. 60 at 31.)

25.  In plaintiff's April 24, 2008 appeal to the second level of review, plaintiff noted his current medication was not working, and that he was in constant pain.  (Dkt. No. 60 at 34.)

26.  In defendant Baca's first level response to plaintiff's appeal No. DVI-X-08-00858, dated May 27, 2008, defendant Baca stated that plaintiff was evaluated by defendant Newman on April 21, 2008, in connection with plaintiff's appeal.  (Dkt. No. 60 at 30.)  Defendant Baca noted that defendant Newman "ordered that [plaintiff's] Neurontin 300 mg be increased and that [plaintiff] be given Hydrocodone APAP 5/500 mg."  (Id.)

27.  In the June 12, 2008 second level response signed by Dr. David Snell, Dr. Snell noted that plaintiff's Unit Health Record reflected plaintiff's referral to Chronic Care, and that plaintiff had been seen by several health care providers on several occasions, the most recent of which was on June 6, 2008, and that plaintiff had an appointment on June 12, 2008.  (Dkt. No. 60 at 28.)  Dr. Snell noted that plaintiff's Pharmacy Profile reflected that plaintiff continued to receive the appropriate pain medication and that plaintiff's current Gabapentin prescription of 600 mg would expire on June 16, 2008, and plaintiff was encouraged to complete a health care request slip to obtain a medication refill.  (Dkt. No. 60 at 28.)

28.  In the June 23, 2008 second level response signed by Dr. David Snell, Dr. Snell noted that defendant Newman saw and examined plaintiff on June 20, 2008 regarding

plaintiff's medical appeal issues, and to determine whether plaintiff's "1845 status of DMN

Mobility Impairment (Lower Extremities) was still plaintiff's DPPV status."  (Dkt. No. 60 at 22.)

Defendant Newman confirmed plaintiff's DPPV status.  (Id.)  Dr. Snell noted that defendant

Newman "changed [plaintiff's] pain medication to help enhance pain control."  (Id.)  Dr. Snell

identified plaintiff's housing restrictions as lower bunk, no stairs and no triple bunk, and

plaintiff's healthcare appliance as a cane and an egg crate mattress.  (Id.)

IV.  Eighth Amendment Claim

        A.  Legal Standard

        Generally, deliberate indifference to a serious medical need presents a cognizable

claim for a violation of the Eighth Amendment's prohibition against cruel and unusual

punishment.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  According to Farmer v. Brennan, 511

U.S. 825, 847 (1994), "deliberate indifference" to a serious medical need exists "if [the prison

official] knows that [the] inmate [ ] face[s] a substantial risk of serious harm and disregards that

risk by failing to take reasonable measures to abate it."  The deliberate indifference standard "is

less stringent in cases involving a prisoner's medical needs than in other cases involving harm to

incarcerated individuals because 'the State's responsibility to provide inmates with medical care

ordinarily does not conflict with competing administrative concerns.'"  McGuckin v. Smith, 974

F.2d 1050, 1060 (9th Cir. 1992) (quoting Hudson v. McMillian, 503 U.S. 1, 6 (1992)), overruled

on other grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997).

Specifically, a determination of "deliberate indifference" involves two elements:  (1) the

seriousness of the prisoner's medical needs; and (2) the nature of the defendant's responses to

those needs.  McGuckin, 974 F.2d at 1059.

        First, a "serious" medical need exists if the failure to treat a prisoner's condition

could result in further significant injury or the "unnecessary and wanton infliction of pain."  Id.

(citing Estelle, 429 U.S. at 104).  Examples of instances where a prisoner has a "serious" need for

medical attention include the existence of an injury that a reasonable doctor or patient would find

important and worthy of comment or treatment; the presence of a medical condition that

significantly affects an individual's daily activities; or the existence of chronic and substantial

pain.  McGuckin, 974 F.2d at 1059-60 (citing Wood v. Housewright, 900 F.2d 1332, 1337-41

(9th Cir. 1990)).

Second, the nature of a defendant's responses must be such that the defendant

purposefully ignores or fails to respond to a prisoner's pain or possible medical need in order for

"deliberate indifference" to be established.  McGuckin, 974 F.2d at 1060.  Deliberate

indifference may occur when prison officials deny, delay, or intentionally interfere with medical

treatment, or may be shown by the way in which prison physicians provide medical care."

Hutchinson v. United States, 838 F.2d 390, 392 (9th Cir. 1988).  In order for deliberate

indifference to be established, there must first be a purposeful act or failure to act on the part of

the defendant and resulting harm.  See McGuckin, 974 F.2d at 1060.  "A defendant must

purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for

deliberate indifference to be established."  Id.  Second, there must be a resulting harm from the

defendant's activities.  Id.  The needless suffering of pain may be sufficient to demonstrate

further harm.  Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002).

Mere differences of opinion concerning the appropriate treatment cannot be the

basis of an Eighth Amendment violation.  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996);

Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).  However, a physician need not fail to

treat an inmate altogether in order to violate that inmate's Eighth Amendment rights.  Ortiz v.

City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).  A failure to competently treat a serious

medical condition, even if some treatment is prescribed, may constitute deliberate indifference in

a particular case.  Id.

In order to defeat defendants' motion for summary judgment, plaintiff must

"produce at least some significant probative evidence tending to [show]," T.W. Elec. Serv., 809

F.2d at 630, that defendants' actions, or failures to act, were "in conscious disregard of an

1    excessive risk to plaintiff's health," <u>Jackson v. McIntosh</u>, 90 F.3d at 332 (citing <u>Farmer</u>, 511 U.S.

2    at 837).

3           B.  <u>Analysis</u>

4           1.  <u>Defendant Baca</u>

5              In his unverified complaint, plaintiff alleges defendant Baca's May 27, 2008

6    appeal response was unreasonable because the pain medications allegedly prescribed were not

7    received by plaintiff.  (Dkt. No. 1 at 7, referring to Dkt. No. 60 at 30.)  In connection with the

8    May 27, 2008 appeal response, plaintiff contends defendant Baca failed to properly investigate

9    plaintiff's complaints, leaving plaintiff in severe, and untreated, pain.  (Dkt. No. 1 at 11.)

10             In plaintiff's second cause of action, plaintiff alleges defendant Baca violated

11   plaintiff's due process rights by allowing each prison institution in California to

12           implement their own medical custom and policy as concerned to
             dispensing and prescribing medications to inmate clients, and not
13           abiding by the medical laws and legislative policies. . . .

14   (Dkt. No. 1 at 13.)  Plaintiff further alleges defendant Baca failed to:  adequately train medical

15   staff in the proper prescription of medications; follow-up on prescribed medications; properly

16   determine what inmates need pain medications; and not reject pain medications based on the

17   institution's policies and custom of abhorrence to drug use.  Plaintiff contends defendant Baca

18   violated plaintiff's due process rights by not investigating plaintiff's pain complaints because of

19   an outdated belief system that "no drugs should be prescribed at all costs" mentality.  (Dkt. No. 1

20   at 13.)

21             As noted above, however, plaintiff has provided three appeal responses provided

22   by defendant Baca:

23             1.  The record reflects that on February 21, 2008, in connection with appeal DVI-

24   X-08-00028, defendant Baca was aware that plaintiff claimed his pain medication ran out on

25   November 11, 2007, and plaintiff allegedly had not been able to get his pain medications

26   renewed for over three weeks.  (Dkt. No. 60 at 21.)  Defendant Baca cancelled this appeal,

without taking any action on plaintiff's appeal, based on plaintiff's alleged failure to return to clinic on February 21, 2008.  (Id.)  However, plaintiff has provided four inmate declarations stating plaintiff only left his cell for meals and pill call.  Plaintiff also alleges there was another inmate with plaintiff's name in plaintiff's housing unit, and plaintiff claims he was not called to clinic on May 21, 2008.

2.  On April 17, 2008, pursuant to appeal DVI-X-08-00541, defendant Baca was aware that plaintiff's medication ran out on February 20, 2008, and plaintiff had submitted paperwork to see a doctor on February 6, 2008, apparently again without success.  (Dkt. No. 60 at 31.)  Plaintiff noted pain medications ordered months ago were still not given.  Plaintiff stated that "[t]his shows the same thing is happening for months.  Somethings ordered I never get, when I complain it's cut off and nothing is given in its place."  (Dkt. No. 60 at 31.)

3.  On May 27, 2008, in connection with appeal DVI-X-08-00858, defendant Baca was made aware again that plaintiff alleged he was supposed to see a doctor in pain management for months, without success.  (Dkt. No. 60 at 30.)  Plaintiff asked to be seen in pain management, for increased medication, to help with muscle spasms, and something to help plaintiff sleep.

Defendant Baca contends that her only role in the alleged violations surrounded her adjudication of plaintiff's inmate appeals, and therefore she is entitled to summary judgment. Defendant Baca did not dispute any of the appeal responses provided by plaintiff.

2.  Application

In order to avoid summary judgment and to establish liability for defendant Baca's role in addressing plaintiff's medical appeals, plaintiff must provide evidence that the medical care plaintiff requested was medically necessary, and that the denial of that care constituted deliberate indifference to his serious medical needs.

"Chronic pain is long-term, unrelenting pain."  Lavender v. Lampert, 242 F.Supp.2d 821, 848 (D. Or. 2002).  The documents provided by plaintiff establish that plaintiff has chronic, severe back pain, which is a serious medical condition that requires treatment.  In

1   addition, plaintiff has provided evidence that a nonprison doctor prescribed plaintiff Methadone,

2   and a prior prison doctor prescribed plaintiff Morphine for plaintiff's chronic pain.  (Dkt. No. 60

3   at 37, 106.)  The record also shows that plaintiff was in need of ongoing treatment for his chronic

4   pain, rather than simply pursuing his administrative appeals to satisfy the exhaustion

5   requirements of 42 U.S.C. § 1997e(a).

6              [This] distinction is important because an appeals coordinator
             does not cause or contribute to a completed constitutional violation
7            that occurs in the past.  See George v. Smith, 507 F.3d 605,
             609-610 (7th Cir. 2007) ("[a] guard who stands and watches while
8            another guard beats a prisoner violates the Constitution; a guard
             who rejects an administrative complaint about a completed act of
9            misconduct does not").  However, if there is an ongoing
             constitutional violation and the appeals coordinator had the
10           authority and opportunity to prevent the ongoing violation, a
             plaintiff may be able to establish liability by alleging that the
11           appeals coordinator knew about an impending violation and failed
             to prevent it.  See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir.
12           1989) (supervisory official liable under Section 1983 if he or she
             knew of a violation and failed to act to prevent it).

13

14   Herrera v. Hall, 2010 WL 2791586, at * 4 (E.D. Cal. 2010).

15              This court finds that the three appeal responses issued by defendant Baca raise a

16   triable issue of material fact as to whether plaintiff suffered a continuing violation of plaintiff's

17   Eighth Amendment right to receive treatment for his chronic back pain.  If plaintiff was unable to

18   obtain medical treatment by completing his health care services request forms, his sole avenue of

19   relief was to submit an inmate appeal.  Arguably, if defendant Baca had reviewed plaintiff's

20   medical file in connection with plaintiff's appeals, defendant Baca would have noted the myriad

21   gaps in plaintiff's pain medication prescription history, as well as his difficulties in obtaining

22   prescription refills.  Moreover, the CDCR Inmate Locator website reflects there are three inmates

23   bearing the names "John Francis" presently in the custody of the CDCR.[5]  The appeal responses

24   suggest that defendant Baca was able to gain medical treatment for plaintiff; for example,

25

26          [5] California Department of Corrections and Rehabilitation Inmate Locator,
       http://inmatelocator.cdcr.ca.gov/search.aspx (last visited May 24, 2011).

                                            17

1  defendant Baca granted plaintiff's request to be seen by pain management. (Dkt. No. 60 at 30.)

2  Defendant Baca provided no evidence demonstrating that defendant Baca could not arrange

3  follow-up medical care or investigate plaintiff's claims further. Indeed, defendant Baca relied

4  solely on plaintiff's deposition. Defendant Baca provided no declaration or other medical

5  evidence to support her alleged claim to summary judgment.[6]

6          Defendant Baca relies on two Ninth Circuit cases in support of her argument that

7  denial of an administrative appeal is not sufficient personal involvement on which to premise a

8  § 1983 action: Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir. 2003), and Mann v. Adams, 855

9  F.2d 639, 640 (9th Cir. 1988). However, these cases addressed alleged due process violations.

10 Here, plaintiff alleges defendant Baca was made aware of plaintiff's serious medical needs, yet

11 was deliberately indifferent, in violation of the Eighth Amendment. Therefore, plaintiff's claim

12 against defendant Baca is not barred by Ramirez or Mann.[7] Accordingly, defendant Baca is not

13 entitled to summary judgment on plaintiff's Eighth Amendment medical claim.

14          However, plaintiff's unsupported allegations that defendant Baca failed to

15 adequately train medical staff or implement appropriate policies or customs in violation of

16 plaintiff's due process rights, are unavailing because (1) plaintiff has provided no verified

17 opposition or evidence in connection with these allegations, and (2) plaintiff has failed to

18

19     [6] In Herrera v. Hall, 1:08-cv-1882 LJO SMS PC, on the defendants' motion for summary
20 judgment, the defendants responsible for reviewing Herrera's administrative appeals provided
   specific declarations as to their authority, the duties of their positions, and actions taken in
   connection with the inmate appeals. Id., May 17, 2011 Findings and Recommendations. A court
21 may take judicial notice of court records. See, e.g., Bennett v. Medtronic, Inc., 285 F.3d 801,
   803 n.2 (9th Cir. 2002) ("[W]e may take notice of proceedings in other courts, both within and
22 without the federal judicial system, if those proceedings have a direct relation to matters at
   issue") (internal quotation omitted).

23
       [7] District courts have not taken a uniform view as to whether Ramirez and Mann
24 preclude imposition of § 1983 liability on defendants whose sole involvement was to deny a
   plaintiff's administrative appeal. Compare Hannon v. Kramer, 2006 WL 1409710 (E.D. Cal.
25 May 23, 2006) ("The resolution of plaintiff's inmate appeal by defendant does not support a
   claim for deliberate indifference to plaintiff's serious medical needs."), with Herrera v. Hall,
26 2010 WL 2791586, at *4 (E.D. Cal. 2010).

1  demonstrate defendant Baca was responsible for, or even involved in, such matters.  To the

2  extent plaintiff sought to raise a due process challenge based on defendant Baca's handling of

3  plaintiff's administrative appeals, such a claim is unavailing under Ramirez and Mann.

4          Accordingly, defendant Baca is not entitled to summary judgment on plaintiff's

5  Eighth Amendment medical claim, but is entitled to summary judgment on plaintiff's due

6  process claims.

7          2.  Defendant Newman

8          In his unverified complaint, plaintiff alleges defendant Newman "was inconsistent

9  in his pain medication schedule, and at times mistakenly forgot to order pain medications, and/or

10  allowed Physician's Assistants to discontinue proper pain medication regimens for . . . plaintiff."

11  (Dkt. Nos. 1 at 9; 60 at 5.)  In his deposition, plaintiff declared that defendant Newman "knew

12  exactly what was wrong with [plaintiff], but he continued to write scrips for only 30 days,

13  knowing it takes anywhere from two weeks to three weeks to get in to see [defendant Newman]

14  again."  (Pl.'s Dep. at 58.)  Plaintiff contends defendant Newman didn't schedule plaintiff for

15  follow-up appointments in a 30-day time period.  (Id.)  Plaintiff claims this scheduling resulted in

16  delays in obtaining his pain medications, sometimes for two to three weeks, but the longest

17  period of which was two months.  (Id.)

18          As noted above, prison officials may exhibit deliberate indifference by delaying

19  necessary medical treatment.  McGuckin, 974 F.2d at 1060, 1062.  Even if the delay in plaintiff

20  receiving pain medications or scheduling follow-up appointments amounted to a constitutional

21  violation, plaintiff has presented no evidence that defendant Newman was responsible for

22  ensuring plaintiff received the medications defendant Newman prescribed or for scheduling

23  follow-up appointments.  Plaintiff has failed to adduce evidence that any such delay was the

24  result of deliberate indifference, rather than mere negligence.

25          It is undisputed that plaintiff was seen four or five times by defendant Newman

26  while plaintiff was housed at DVI.  The documents provided by plaintiff confirm that defendant

1   Newman saw plaintiff on March 17, 2008, to determine plaintiff's DPPV status. (Dkt. No. 60 at

2   23-24.) Defendant Newman saw plaintiff on April 2, 2008, and prescribed plaintiff Gabapentin.

3   (Dkt. No. 60 at 27.) Defendant Newman saw plaintiff on April 21, 2008, and increased

4   plaintiff's Neurontin and prescribed Hydrocodone. (Dkt. No. 60 at 30.) Defendant Newman saw

5   plaintiff on June 20, 2008, regarding plaintiff's medical appeal issues. (Dkt. No. 60 at 22.) It is

6   undisputed that at plaintiff's first visit with defendant Newman on an unidentified date,

7   defendant Newman examined plaintiff, performed appropriate tests, and prescribed Vicodin and

8   Neurontin for plaintiff's pain. (Undisputed Fact No. 8.) None of these documents, on their face,

9   without more, evidence deliberate indifference on the part of defendant Newman.

10          Despite this documentary evidence, plaintiff has failed to point to specific

11   evidence in support of his claims. Plaintiff has not provided the specific dates he claims

12   defendant Newman was inconsistent in prescribing medication, or allegedly forgot to prescribe

13   medications, or failed to note a follow-up appointment was required, or allegedly allowed a

14   physician's assistant to discontinue plaintiff's medication. Plaintiff does not identify, with

15   probative evidence, the two month period he allegedly was deprived of all pain medications.

16   Moreover, it does not appear any of the medical records provided by plaintiff are signed by

17   defendant Newman. Without the specific medical record completed by defendant Newman, the

18   court cannot determine whether the treatment provided, or any alleged failure to treat, rose to the

19   level of deliberate indifference. Plaintiff did provide medical records signed by Dr. Mendoza.

20   (Dkt. No. 60 at 109, 111.) Plaintiff provided some pharmacy records from DVI, but all reflect

21   Dr. Mendoza as plaintiff's doctor, not defendant Newman. (Dkt. No. 60 at 102-07.)

22          Plaintiff has presented no evidence to show that it was defendant Newman who

23   was responsible for the alleged gaps in plaintiff's receipt of pain medications. Plaintiff has also

24   failed to present evidence that defendant Newman was responsible for scheduling thirty day

25   follow-up appointments, rather than nursing or other clerical staff. In the absence of any

26   evidence linking defendant Newman to the specific failures alleged, defendant Newman is

1    entitled to summary judgment.

2           Plaintiff also claims that defendant Newman was somehow deliberately

3    indifferent by prescribing pain medications in thirty day increments.  However, Dr. Mendoza

4    prescribed Morphine in an increment of less than thirty days.  (Dkt. No. 60 at 102, 104, 107.)  Dr.

5    Mendoza prescribed plaintiff 30 tablets to be taken one tablet, twice a day.  (Id.)  Many of

6    plaintiff's other medications were prescribed 30 tablets at a time.  (Id.)  Plaintiff has provided no

7    evidence demonstrating that writing a prescription for a thirty day period amounts to deliberate

8    indifference under the Eighth Amendment, and has provided no evidence showing that defendant

9    Newman had a culpable state of mind when writing any prescriptions for pain medications.

10          For all of the above reasons, plaintiff has failed to demonstrate that defendant

11   Newman was deliberately indifferent to plaintiff's serious medical needs.  Given the undisputed

12   facts, no reasonable jury could find that defendant Newman violated plaintiff's Eighth

13   Amendment rights.  Therefore, defendant Newman's motion for summary judgment should be

14   granted.

15   V.  Qualified Immunity

16          Because the court has found defendant Newman is entitled to summary judgment,

17   the court need not address defendant Newman's argument for qualified immunity.

18   VI.  Recommendations

19          Accordingly, for all of the reasons set forth above, IT IS HEREBY

20   RECOMMENDED that the January 4, 2011 motion for summary judgment (dkt no. 57) be

21   granted in part and denied in part, as follows:

22          1.  Defendant Baca's motion for summary judgment on plaintiff's Eighth

23   Amendment medical claims be denied;

24          2.  Defendant Baca's motion for summary judgment on plaintiff's due process

25   claims be granted; and

26          3.  Defendant Newman be granted summary judgment.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  May 25, 2011

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

fran0640.msj